.

# EX.10



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
PROVIDER REIMBURSEMENT REVIEW BOARD
2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670
Phone: 410-786-2671          FAX: 410-786-5298

... W. ...es, Chairman
Henry C. Wessman, Esq.
Stanley J. Sokolove, C.P.A.
Gary B. Blodgett, D.D.S.
Suzanne Cochran, Esq.

Refer to:

CERTIFIED MAIL
--------------

**MAY 2 1 2002**

Quality Reimbursement Services
Amrish C. Mathur
150 N. Santa Anita Avenue
Suite 570A
Arcadia, CA 91006

Re: Group Acknowledgment and Critical Due Dates
    Case Number: 02-1736G
    Group Name: BMHCC 98 Medicare DSH SSI Proxy Group
    Appealed Year - FYE: 12/10/98
    Group Representative: Amrish C. Mathur

The Provider Reimbursement Review Board ("Board") has received your
request for a group appeal.  You will need to obtain a copy of the Board's
instructions which are located on the Board's web site at
www.hcfa.gov/regs/prrb.htm.  If Internet access is not available to you,
you may call the Board at (410) 786-2671 and request that a copy be
mailed to you.

You must reference the case number and group title on all future
correspondence with the Board.  If any of the above information is
incorrect, you must inform the Board, in writing, within 30 days of
this letter.

DUE DATES & REQUIRED DOCUMENTS
------------------------------

1st of May 2003: The Group Representative is to mail a letter to the
    Board stating that the group is complete and identifying the
    lead intermediary.  The Group Representative must also forward
    the lead intermediary a copy of this Group Acknowledgment and
    Critical Due Dates letter.

1st of July 2003: The Group Representative must file a preliminary
    position paper with the lead intermediary (with a letter to the
    Board certifying that the preliminary due date has been met and
    a copy of the first page only of the preliminary position paper).
    The Group Representative must also complete and submit the
    Schedule of Providers with associated jurisdictional
    documentation to the lead intermediary.

1st of September 2003: The lead intermediary must file a preliminary
    position paper with the Group Representative (with a letter to
    the Board certifying that preliminary due date has been met and
    a copy of the first page only of the preliminary position
    paper). The lead intermediary must also forward the Schedule
    of Providers, the associated jurisdictional documents and
    comments regarding jurisdiction to the Board.

1st of November 2003: Final position papers are due from both parties.



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
PROVILER REIMBURSEMENT REVIEW BOARD
2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670
Phone: 410-786-2671          FAX: 410-786-5298

... V. ...es, Chairman
Henry C. Wessman, Esq.
Stanley J. Sokolove, C.P.A.
Gary B. Blodgett, D.D.S.
Suzanne Cochran, Esq.

Refer to:

The Group Representative is responsible for pursuing the group appeal in accordance with the Board's Instructions. You must file all required documentation, including position papers, regardless of any outstanding jurisdictional challenges, motions or subpoena requests. If the group representative misses any of its due dates, the Board will dismiss the group appeal.  The Board will not send a due date reminder.  If the Intermediary fails to meet its deadlines, the Board will contact the Centers for Medicare & Medicaid Services (CMS) about contract compliance and will schedule a hearing date.

## TENTATIVE HEARING DATE
----------------------

March 2004: Tentative month and year of hearing.

The Board will send the parties a Notice of Board Hearing to notify you of the specific time, date and location of the hearing.  The Notice of Hearing will be issued at least 30 days prior to the actual hearing date.

## OPTIONS
-------

The Group Representative may make a written request, at any time, that:
     the month of hearing be rescheduled to an earlier month;
     the case be heard based on the submitted record;
     the case be conducted by video or teleconference;
     the case be resolved through alternative dispute resolution/mediation;
     the case be reviewed in a pre-hearing conference with a Board member.

The Group Representative must continue to follow the due dates set forth in this letter until you are advised regarding your request by the Board.

Steven R. Kirsh
Division of Jurisdiction and Case Management

cc: Mr. Wilson Leong, BCBSA
    225 N. Michigan Avenue
    Chicago, Illinois  60601-7680

    Mutual Of Omaha
    Mr. Tom Bruce
    Medicare Audit and Reimbursement
    P.O. Box 1604
    Omaha, Nebraska  68101

    Mike Shaver
    Appeals Coordinator
    730 Chestnut Street, Third Floor
    Chattanooga, TN 37402 1790

# **Exhibit 1**

US-CT-APP-8, MED-GUIDE 1996-1 MED-GUIDE-TB ¶44,220, Deaconess Health Services Corp. v. Shalala., U.S. Court of Appeals for the Eighth Circuit, (May 22, 1996)

**Deaconess Health Services Corp. v. Shalala.**

U.S. Court of Appeals for the Eighth Circuit, No. 95-4126EM, May 22, 1996

Before: McMILLIAN, FAGG, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

**Medicare and Medicaid: Disproportionate Share Hospitals**

**Missouri—Prospective payment systems—Special treatment of certain facilities—Disproportionate share hospital calculation.—**
A federal district court in Missouri properly determined that the Secretary incorrectly construed the Medicaid low-income proxy calculation used to determine disproportionate share hospital designation as counting only those patient days that actually were paid by state Medicaid plans. The language of the proxy was not ambiguous in directing the Secretary to count all patient days attributable to patients who were eligible for medical assistance under a state Medicaid plan regardless of whether the days actually were paid for by the state plan. The Secretary's construction, focusing on actual payment, conflicted with the statute's focus on patient eligibility. If an individual is eligible for medical assistance under both a state Medicaid plan and Medicare Part A, then all days on which services were received should be included in the proxy calculation regardless of whether all such days were paid by the state Medicaid plan.

See ¶4269.18, ¶14,725.13.
 **The opinion of the U.S. District Court, Eastern District of Missouri (1995-2 Transfer Binder ¶43,725 ) is affirmed.**

 PER CURIAM: Donna E. Shalala, Secretary of Health and Human Services, appeals the adverse grant of summary judgment by the district court in favor of Deaconess Health Services Corporation. *Deaconess Health Servs. Corp. v. Shalala*, 912 F. Supp. 438 (E.D. Mo. 1995). Having carefully reviewed the record and the parties' briefs, we conclude summary judgment was properly granted. Our decision is guided by the Sixth Circuit's recent decision in *Jewish Hosp., Inc. v. Secretary of Health & Human Servs.*, 19 F.3d 270 (6th Cir. 1994). We thus affirm on the basis of the district court's thorough, well-reasoned opinion. *See* 8th Cir. R. 47B.

 [¶44,221—44,398]  Reserved.

# **<u>Exhibit 2</u>**

US-DIST-CT, MED-GUIDE 1995-2 MED-GUIDE-TB ¶43,725, Deaconess Health Services Corp. v. Shalala., U.S. District Court, Eastern District of Missouri, Eastern Division, (Oct. 16, 1995)

Copyright 1996, CCH Incorporated

Deaconess Health Services Corp. v. Shalala.

U.S. District Court, Eastern District of Missouri, Eastern Division, No. 4:93 CV 1594 DDN, Oct. 16, 1995

### Medicare and Medicaid: Disproportionate Share Hospitals

Prospective payment systems--Special treatment of certain facilities—Disproportionate share hospital calculation.--

The Secretary incorrectly construed the Medicaid Low Income Proxy calculation used to determine disproportionate share hospital designation as counting only those patient days that actually were paid by state Medicaid plans. The language of the proxy was not ambiguous in directing the Secretary to count all patient days attributable to patients who were eligible for medical assistance under a state Medicaid plan regardless of whether the days were actually paid for by the state plan. The Secretary's construction, focusing on actual payment, conflicted with the statute's focus on patient eligibility. If a person is eligible for medical assistance under both a state Medicaid plan and Medicare Part A, then all days on which services were received should be included in the proxy calculation regardless of whether the state Medicaid plan paid for all such days.

See ¶4269.18, ¶14,725.13.

*MEMORANDUM*

This matter is before the Court upon the cross motions of the parties for summary judgment under Federal Rule of Civil Procedure 56. The parties have consented to the exercise of jurisdiction by the undersigned United States Magistrate Judge. 28 U.S.C. §636(c).

Plaintiff, Deaconess Health Services Corporation, is a not-for-profit hospital in St. Louis, Missouri, that participates in the Medicare and Medicaid programs. Plaintiff commenced this action on July 9, 1993, challenging the construction adopted by the defendant, the Secretary of the Department of Health and Human Services ("the Secretary"), of a Medicare statute directing the Secretary to make additional Medicare payments to hospitals, such as the plaintiff, that serve "a significantly disproportionate number of low-income patients." Specifically, plaintiff challenges the Secretary's regulatory interpretation of the disproportionate share payment adjustment for inpatient hospital services under the Medicare "Prospective Payment System" (PPS). 42 U.S.C. §1395ww(d)(5)(F); 42 C.F.R. §412.106(b). Plaintiff seeks declaratory and injunctive relief and additional payment the hospital alleges it is owed under the Medicare statute.

Based on the record proffered by the parties, the undersigned finds the following facts undisputed:

*FACTS*

1. Congress enacted the Medicare program (Title XVIII of the Social Security Act) in 1965. Pub. L. No. 89-97, §102(a); 42 U.S.C. §§1395 *et seq.* Medicare is a health insurance program that pays for covered medical care primarily to

US-DIST-CT, MED-GUIDE 1995-2 MED-GUIDE-TB ¶43,725, Deaconess Health Services Corp. v. Shalala., U.S. District Court, Eastern District of Missouri, Eastern Division, (Oct. 16, 1995)
Copyright 1996, CCH Incorporated

qualifying aged and disabled persons. The Medicare program consists of two main parts. Part A ("Hospital Insurance Benefits") authorizes payment for primary institutional care, including hospital, skilled nursing facility, and home health care. 42 U.S.C. §§1395c-1395i-4. Part B ("Supplementary Medical Insurance Benefits") authorizes payment for physicians' and other non-hospital supplemental services. 42 U.S.C. §§1395j-1395w-4. This case involves Medicare payment for hospital services under Part A. Medicare Part A pays the costs of inpatient hospital services and related post-hospital services, and is funded by hospital insurance taxes. 42 U.S.C. §§1395c, 1395d, 1395i. Part A services are furnished by "providers of services," and a hospital may participate in the Medicare program as a provider by entering into a provider agreement with the Secretary. 42 U.S.C. §§1395x(u), 1395cc. Plaintiff is a hospital participating in the Medicare program.

2. Congress also enacted the Medicaid program (Title XIX of the Social Security Act) in 1965. Pub. L. No. 89-97, §121(a); 42 U.S.C. §§1396, *et seq.* Medicaid is a cooperative federal-state program that furnishes health care to indigent persons who are aged, blind, or disabled, or members of families with dependent children, who meet specified eligibility requirements. 42 U.S.C. §1396, *et seq.* The program is jointly financed by the federal and state governments and is administered by the states. *Id.*; 42 C.F.R. §430.0.

3. States that choose to participate in the Medicaid program must submit a "state plan" that fulfills the broad requirements imposed by the statute and regulations. 42 U.S.C. §1396a. Within those broad federal rules, each state determines the type and range of services that are covered, the rules for eligibility, and the payment levels for services. 42 C.F.R. §430.0. The statute specifies the amount, duration, and scope of medical services which must be covered as well as those which may be covered at state option. *See* 42 U.S.C. §§1396a(a)(10), 1396d. All states must furnish certain minimum benefits, including "inpatient hospital services." *See* 42 U.S.C. §§1396a(a)(10)(A), 1396d(a)(1). The statute also specifies the groups of individuals who must be entitled as well as those who may be entitled at state option. *See* 42 U.S.C. §§1396a(a)(10). Under the Medicaid program, states must provide medical assistance to certain "categorically needy" persons, defined as those persons whose income is below a certain identified level and who are either aged, blind, or disabled, or members of families with dependent children. 42 U.S.C. §1396a(a)(10)(A). The statute also permits states, at their option, to provide medical assistance to other groups of "categorically needy" persons, and to certain "medically needy" individuals (individuals who would be categorically needy except for their slightly higher income and resources). *See* 42 U.S.C. §1396a(a)(10)(ii). Because of the considerable discretion left to states in formulating state plans, Medicaid programs vary greatly from state to state, both with regard to eligible persons (groups of persons covered) and covered services (benefits provided).

4. Among the benefits covered by Medicare are hospital services. For cost reporting years beginning before October 1, 1983, the Medicare program reimbursed hospital services on a "reasonable cost" basis. 42 U.S.C. §1395f(b). Effective with cost reporting periods beginning on or after October 1, 1983, Congress adopted a prospective payment system ("PPS") to reimburse most hospitals, including plaintiff, for operating costs of inpatient hospital

US-DIST-CT, MED-GUIDE 1995-2 MED-GUIDE-TB ¶43,725, Deaconess Health Services Corp. v. Shalala., U.S. District Court, Eastern District of Missouri, Eastern Division, (Oct. 16, 1995)
Copyright 1996, CCH Incorporated

services. 42 U.S.C. §1395ww(d). Under PPS, a hospital's actual costs do not determine the Medicare payment that the hospital will receive for its operating costs. Instead, Medicare payments are based upon predetermined nationally applicable rates set on a per-discharge basis. Hospitals are paid a fixed amount for each patient based on one of approximately 490 diagnosis-related groups, subject to certain payment adjustments. 42 U.S.C. §1395ww(d)(1)-(d)(4); 42 C.F.R. Part 412.

5. When Congress enacted Medicare PPS in 1983, it authorized the Secretary to provide an adjustment, called the disproportionate share adjustment, to PPS payments for hospitals that serve a disproportionate share of low income patients. 42 U.S.C. §1395ww(d)(5)(F). *See* Social Security Amendments of 1983, Pub. L. No. 98-21, §601(e), codified at 42 U.S.C. §1395ww(d)(5)(C)(i) (1983). This reflected Congressional judgment that low-income patients are usually in poorer health and cost more to treat than others. *Rye Psychiatric Hospital Center, Inc. v. Shalala*, 52 F.3d 1163, 1164 (2d Cir. 1935), *cert. denied*, No. 95-110, 1995 WL 437230 (Oct. 10, 1995). The Secretary, however, declined to make such an adjustment. 48 Fed. Reg. 39,783 (1983). Congress then directed the Secretary, by December 31, 1984, to develop and publish a disproportionate share definition and identify hospitals that met that definition. Deficit Reduction Act of 1984, Pub. L. No. 98-369, §2315(h), codified at 42 U.S.C. §1395ww note. By July 1985, the Secretary had not yet complied with this congressional mandate, which resulted in a group of hospitals obtaining a court order directing the Secretary to implement the disproportionate share statutory provision. *See Samaritan Health Center v. Heckler*, 636 F. Supp. 503 (D.D.C. 1985). In 1986, after the Secretary issued disproportionate share criteria (50 Fed. Reg. 53,398-53,400 (1985)), Congress amended the Medicare statute to prescribe a statutory definition of disproportionate share hospitals. Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. No. 99-272, §9105 (1986); *Samaritan Health Center v. Bowen*, 646 F. Supp. 343, 345-47 (D.D.C. 1986); 42 U.S.C. §1395ww(d)(5)(F).

6. As amended, the Medicare statute directs the Secretary to make an add-on payment for PPS hospitals which serve "a significantly disproportionate number of low-income patients." 42 U.S.C. §1395ww(d)(5)(F)(i)(I). Hospitals qualify under this standard if their "disproportionate patient percentage" exceeds certain thresholds, and the amount of the add-on disproportionate share payment for qualifying hospitals depends on the extent to which their disproportionate patient percentage exceeds the thresholds. 42 U.S.C. §1395ww(d)(5)(F)(v), (vii). The Medicare statute defines "disproportionate patient percentage" for a cost reporting period as "the sum of--

(I) the fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under part A of this title and were entitled to supplemental security income benefits (excluding any State supplementation) under title XVI of this Act, and the denominator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under part A of this title, and

(II) the fraction (expressed as a percentage), the numerator of which is the

number of the hospital's patient days for such period *which consist of
patients who (for such days) were eligible for medical assistance* under a
State plan approved under title XIX [Medicaid], but who were not entitled to
benefits under part A of this title, and the denominator of which is the
total number of the hospital's patient days for such period.

42 U.S.C. §1395ww(d)(5)(F)(vi) (emphasis added). The second fraction, which
has been referred to as the "Medicaid low income proxy," is the subject of the
dispute in this case. The Medicaid fraction is just one factor used in
determining Medicare reimbursement.

7. On May 6, 1986, the Secretary adopted regulations implementing the
statutory disproportionate share add-on payment. *See* 51 Fed. Reg.
16,772,16,776-78, 16,788 (1986), codified at 42 C.F.R. §412.106. The
regulation sets forth the Secretary's interpretation of the Medicaid fraction.
The Secretary interpreted the statutory language as follows:

Total Medicaid inpatient days will include all covered days attributable to
Medicaid patients including any inpatient days for Medicaid patients who are
members of a health maintenance organization. Section 1886(d)(5)(F)(vi)(II)
of the Act describes Medicaid patient days as those "... which consist of
patients who (for such days) were eligible for medical assistance under a
State plan approved under title XIX...." Therefore, Medicaid covered days
will include only those days for which benefits are payable under title XIX.
*Any day of a Medicaid patient's hospital stay that is not payable by the
Medicaid program will not be counted as a Medicaid patient day since the
patient is not considered eligible for Medicaid coverage on those days.* For
example, if a patient is hospitalized for 15 days and is eligible for
Medicaid benefits for 10 of those days, only the 10 covered days will be
considered Medicaid patient days for purposes of determining a hospital's
disproportionate patient percentage.

51 Fed. Reg. 16,777 (1986) (emphasis added). During the rulemaking process,
commenters objected to the proposed rule, arguing that all inpatient days
associated with a Medicaid recipient should be counted whether or not the
patient was actually covered by Medicaid for those days. The commenters argued
that, since a patient would still be "eligible" for Medicaid benefits even
though part or all of the patient's care may not be covered by Medicaid for a
certain day, all patient days for which care was actually provided to a
Medicaid eligible individual should be counted. 51 Fed. Reg. 31,460 (1986). In
response, the Secretary stated that:

We believe that the parenthetical phrase "for such days" in section
1886(d)(5)(F)(vi)(II) of the Act was intended to modify the phrase "eligible
for medical assistance" and that Congress intended to include only such
patient days for which the Medicaid patient was eligible to have his or her
care paid for by the Medicaid program. We believe evidence of Congressional
intent in this regard may be found in the legislative history of section
1886(d)(5)(F)(vi) of the Act.

The Conference Report described the House bill on section 9105 of Pub. L.
99-272 as defining low income patients as follows:

US-DIST-CT, MED-GUIDE 1995-2 MED-GUIDE-TB ¶43,725, Deaconess Health Services Corp. v. Shalala., U.S. District Court, Eastern District of Missouri, Eastern Division, (Oct. 16, 1995)
Copyright 1996, CCH Incorporated

The proxy measure for low income would be the percentage of a hospital's total inpatient days attributable to medicaid patients (including medicaid-eligible medicare beneficiaries)--medicare/medicaid crossovers).

(See H.R. Rep. No. 99-453, 99th Cong., 1st Sess. 459 (1985)). The phrase "inpatient days attributable to medicaid patients" supports the commenters' interpretation that all days that are attributable to Medicaid patients (that is, for which the patient is Medicaid-eligible) must be included in the numerator of the definition. However, the House bill's definition was not ultimately accepted by the Conference Committee. The Conference Report states that:

The percentage of low income patients will be defined as the total number of inpatient days attributable to Federal Supplemental Security Income beneficiaries divided by the total number of medicare patient days, plus the number of *medicaid patient days* divided by total patient days.

(Emphasis added.)

(See H.R. Rep. No. 99-453, 99th Cong., 1st Sess. 461 (1985)). The substitution of the term "number of medicaid patient days" in the Conference agreement for the previous term "attributable to medicaid patients" suggests that Congress intended to adopt the definition as we currently understand it (that is, only hospital days covered by Medicaid should be included in the numerator). We believe that Congress consciously changed the focus of the Medicaid definition from the number of days that may be attributable to individuals eligible for Medicaid to the actual "number of Medicaid patient days" (that is, days that were paid for by the State's Medicaid program).

We believe this interpretation, that only Medicaid covered days should be counted, is not inconsistent with the statutory scheme as a whole, since the formula in section 1886(d)(5)(F)(vi) of the Act does not purport to identify all indigent patients. Rather, it refers to certain Medicare and Medicaid patients as an easily and objectively determined proxy for the indigent. Thus, under any reading of the statute, not all indigent patients are included in the formula. A Medicaid eligible recipient who has exhausted his or her benefits is thus situated similarly to the indigent patient who is not eligible for Medicaid at all, and so it is logical to treat them the same for purposes of determining the disproportionate patient percentage.

In addition, given the relatively short timeframe for implementing section 1886(d)(5)(F)(vi) of the Act, we believe it is reasonable to assume that Congress anticipated that the Medicare cost report would serve as the primary source for Medicaid patient day statistics. Our definition of Medicaid patient days is consistent with the way we require Medicaid days to be reported on the Medicare cost report. On that form, a day of care is designated a Medicaid patient day only if the Medicaid program is the primary payor. There is no provision on the form for a patient day being counted as more than one type for payment purposes. We do not believe that Congress intended that an additional reporting mechanism, possibly tied to State eligibility records, be developed to obtain Medicaid statistics on

US-DIST-CT, MED-GUIDE 1995-2 MED-GUIDE-TB ¶43,725, Deaconess Health Services Corp. v. Shalala., U.S. District
Court, Eastern District of Missouri, Eastern Division, (Oct. 16, 1995)
Copyright 1996, CCH Incorporated

noncovered patient days.

Therefore, since Congress clearly intended that the disproportionate share
adjustment be implemented promptly with the data currently available, we
believe the definition of Medicaid patient days published in the interim
final rule is the one that Congress intended that we adopt.

We should also point out that our interpretation that the Medicaid portion
of the definition of the disproportionate share percentage under section
1886(d)(5)(F)(vi)(II) of the Act refers only to Medicaid covered days is
consistent with our interpretation of the Medicare portion under section
1886(d)(5)(F)(vi)(I) of the Act (which uses similar language) to refer only
to Medicare covered days.

51 Fed. Reg. 31,460-61 (1986). Because the Secretary interprets the Medicaid
low income proxy as including only inpatient days actually paid for by state
Medicaid plans, days that exceed the length-of-stay payment limits established
by states, such as Missouri, that pay hospitals under Medicaid on a per diem
basis, will not be counted as Medicaid days under 42 U.S.C.
§1395ww(d)(5)(F)(vi)(II). 42 C.F.R. §412.106(b). See 51 Fed. Reg. 31,460-61
(1986).

8. The Secretary's regulation, 42 U.S.C. §412.106(b), has been used since
May 1986 to calculate Medicare reimbursement of hospitals that treat
disproportionate numbers of low income patients. Although Congress has revised
other aspects of Medicare reimbursement for low income patient hospital care,
it has left the Secretary's interpretive regulation undisturbed.

9. States have considerable flexibility in establishing payment rates for
hospital services under their Medicaid programs. 42 U.S.C. §1396a(a)(13)(A).
Most states use a prospective payment system similar to Medicare's in that
they pay a fixed amount for a particular DRG. Complaint at 5, ¶17; Answer at
4, ¶17. However, some states pay a per diem rate. Id. Some of these states pay
the per diem rate irrespective of a patient's length of stay. Id. Others,
however, establish limits on the number of days for which they will make
payment. Id. In these states, hospitals receive as payment the lower of the
aggregate limit or the per diem rate multiplied by the number of days in a
patient's stay. Id. Thus, they do not receive any additional payment for a
stay once the day payment limit has been reached. Id.

10. The State of Missouri pays hospitals for inpatient hospital services
furnished under the Missouri Medicaid program on a per diem basis. 13 C.F.R.
§70-15.010(1); Complaint at 5, ¶18; Answer at 4, ¶18. Certain hospitals (known
as Tier 1 hospitals) are not subject to length-of-stay payment limits. 13
C.S.R. §70-15.010(6)(C)2.A.; Complaint at 5, ¶18; Answer at 4, ¶18. However,
all other hospitals in the state are subject to specified length-of-stay
payment limits. 13 C.S.R. §7015.030(1); Complaint at 5, ¶18; Answer at 4, ¶18.
During its fiscal years ending September 30, 1988, and September 30, 1989
(fiscal years 1988 and 1989), plaintiff did not qualify as a Tier 1 hospital
under the Missouri Medicaid program. Therefore, it was subject to the Missouri
length-of-stay payment limitations for inpatient hospital services.

US-DIST-CT, MED-GUIDE 1995-2 MED-GUIDE-TB ¶43,725, Deaconess Health Services Corp. v. Shalala., U.S. District Court, Eastern District of Missouri, Eastern Division, (Oct. 16, 1995)
Copyright 1996, CCH Incorporated

11. Part A Medicare providers, such as plaintiff, are paid by a fiscal intermediary (an insurance company under contract with the Secretary) designated by the provider and the Secretary. 42 U.S.C. §1395h; 42 C.F.R. §421.103. At the close of a fiscal year, a provider of services submits a "cost report." 42 C.F.R. §§413.20(b), 413.24(f). The fiscal intermediary analyzes and audits the cost report and informs the provider of a final determination of Medicare reimbursement. 42 C.F.R. §405.1803.

12. The fiscal intermediary issued Deaconess's Notice of Amount of Medicare Program Reimbursement ("NPR") pertaining to its cost reporting periods ending September 30, 1988, and September 30, 1989, respectively. (Tr. 39-41, 100-03.) During the hospital's two Medicare cost reporting periods ending September 30, 1988, and September 30, 1989, Deaconess rendered services to Medicare beneficiaries. In determining Deaconess's disproportionate share adjustment for those fiscal years, the hospital's fiscal intermediary included only those days for which payment was made under the Missouri Medicaid program (the state's length-of-stay Medicaid payment limits). It did not include all patient days in which care was provided to a Medicaid patient. The intermediary's exclusion of these Medicaid days reduced plaintiff's Medicare disproportionate patient percentage. The effect was to reduce plaintiff's Medicare payment by approximately $127,610 for fiscal year 1988 and approximately $144,825 for fiscal year 1989.

13. A provider dissatisfied with its intermediary's determination may file an appeal with an administrative body known as the Provider Reimbursement Review Board ("Board"). 42 U.S.C. §1395oo(a). If the Board determines that it lacks the authority to decide an issue raised by the provider, the provider may obtain immediate judicial review. 42 U.S.C. §1395oo(f)(1). Deaconess timely appealed the NPRs to the Provider Reimbursement Review Board (PRRB). (Tr. 35-38, 95-99.) It challenged the intermediary's calculation of the Medicaid fraction, contending that the Medicaid days excluded by its Medicare fiscal intermediary must be included as Medicaid days in computing its Medicare disproportionate patient percentage. The PRRB issued determinations that it lacked the authority to decide the issue raised by plaintiff. Administrative Record at 1-2, 72-73. Pursuant to 42 U.S.C. §1395oo(f)(1), Deaconess requested expedited judicial review of the intermediary's calculation of the disproportionate share patient percentage. The PRRB granted Deaconess's request on May 7, 1993. Complaint ¶25. Plaintiff thereupon filed the instant lawsuit.

*DISCUSSION*

At issue in this case is the Secretary's interpretative definition of the numerator of the Medicaid fraction, specifically the language that "patients who (for such days) were eligible for medical assistance under a state plan approved under (the Medicaid program)." 42 U.S.C. §1395ww(d)(5)(F)(vi)(II).

The underlying issue is whether the numerator should be calculated by counting all patient days attributable to Medicaid patients, whether or not paid for by state Medicaid plans (the construction urged by plaintiff) or whether the numerator should be calculated by counting only those days that are actually paid by state Medicaid plans (the construction chosen by the

Secretary).

Plaintiff argues that the statutory mandate is clear and that the
Secretary's interpretation is contrary to the plain meaning of the statute. In
the alternative, the plaintiff argues that if the statute is ambiguous, then
the Secretary's construction is unreasonable. In support of its position,
plaintiff relies on *Jewish Hospital, Inc. v. Secretary of HHS*, 19 F.3d 270
(6th Cir. 1994), in which the Sixth Circuit rejected the Secretary's
construction of this section of the statute as inconsistent with the plain
meaning of the Medicare statute and unreasonable. The plaintiff also relies on
*Legacy Emanual Hospital and Health Center v. Shalala*, 1995 WL 433608 (D. Or.
April 20, 1995), which adopted the reasoning of the *Jewish Hospital* court on
the same issue. There is no dispute that the issue before this Court is
identical to the question of law ruled upon by those two courts.

The defendant argues that the statute does not express the unambiguous
intent of Congress and that the Secretary's regulation is based upon a
permissible construction of the statute. The defendant argues that plaintiff
has failed to establish that the statute is unclear on its face or that the
Secretary's interpretation is impermissible under the principles set forth in
*Chevron, U.S.A., Inc. v. Natural Resources Defense*, 467 U.S. 837 (1984). To
the extent that the panel majority in *Jewish Hospital* found to the contrary,
the defendant argues that it is wrong and that the dissent was correct in
finding that the statute is ambiguous and that the Secretary's interpretation
is a permissible construction to which judicial deference is owed. The
defendant further argues that the Secretary's construction gives full effect
to all words in the statute and takes into account the limited data available
to the Secretary when the adjustment became effective. The defendant also
argues that the Secretary's interpretation has been in effect for eight years
and the Congress, with full knowledge of that interpretation, has left it
undisturbed. The defendant asks the Court to find that the Secretary's
construction of the Medicaid fraction is clearly a permissible one which
should be upheld.

*Chevron* establishes the standard that this court must use in reviewing an
agency's construction of a statute that it administers:

First, always, is the question whether Congress has directly spoken to the
precise question at issue. If the intent of Congress is clear, that is the
end of the matter; for the court, as well as the agency, must give effective
to the unambiguously expressed intent of Congress. If, however, the court
determines that Congress has not directly addressed the precise question at
issue, the court does not simply impose its own construction on the statute,
as would be necessary in the absence of an administrative interpretation.
Rather, if the statute is silent or ambiguous with respect to the specific
issue, the question for the court is whether the agency's answer is based on
a permissible construction of the statute (footnotes omitted).

*Chevron*, 456 U.S. at 842-43. In examining Congress' intent, the court uses
traditional tools of statutory construction. *Chevron*, 456 U.S. at 842-43 n.9.
A statute must be construed " 'to give effect, if possible, to every word
Congress used' " *Washington Hospital Center v. Bowen*, 795 F.2d 139, 145 (D.C.

Cir. 1986) (quoting *Reiter v. Sonotone Corp.,* 442 U.S. 330, 339 (1979)).

If the court determines that the statute is silent or ambiguous on the issue, the court looks at the agency's interpretation. *Chevron,* 467 U.S. at 842-43. In doing so, the court does not have to conclude that the agency construction was the only one permissible or that the agency construction was one the court would have reached. *Id.* at 843 n.11. It is properly the role of an agency to which Congress has delegated policy making responsibilities, and not the courts, to resolve ambiguous statutory issues "which congress itself either inadvertently did not resolve, or intentionally left to be resolved by the agency charged with administration of the statute in light of everyday realities." *Chevron,* 467 U.S. at 865-66.

*The Language of the Statute*

Plaintiff argues that the Secretary's construction conflicts with the plain meaning of the Medicare statute in several ways: (1) It conflicts with the statute's focus on a patient's eligibility, rather than a state's payment to a hospital; (2) it construes the words "medical assistance" to mean "inpatient hospital services" when, in fact, "inpatient hospital services" is only one of twenty-five services encompassed within "medical assistance"; (3) it adopts a standard unrelated to whether patients are "low-income patients"; (4) it assumes that all states pay for services on the basis of days of care when, in fact, the majority do not; and (5) it effectively deletes key passages from the statutory language.

First, the plaintiff argues that the Secretary's construction conflicts with the statute's focus on a patient's eligibility, rather than a state's payment to a hospital. The statute refers to patient days "which consist of patients who (for such days) were *eligible* for medical assistance under a State plan approved under [Medicaid]" (emphasis added).

The Secretary argues that the plaintiff has written the words "for such days" out of the statute and that the phrase "for such days" means "state paid days" or the actual duration of the state rendered Medicaid benefits. The *Jewish Hospital* dissent found that the parenthetical "for such days" actually had meaning and was not superfluous and that the phrase "means patient days *actually paid* by Medicare." *Jewish Hospital,* 19 F.3d at 279 (Batchelder, J., dissenting). Defendant argues that being "eligible" is just one part of the broader statutory formula used in the Medicaid fraction, and it cannot be construed in isolation from the rest of the statutory language. The Secretary notes that the words "for such days" appear in the parallel language of the Medicare fraction and that her interpretation harmonizes the use of the phrase "for such days" found in both the Medicare and Medicaid fractions and gives the same effect to that parenthetical language in the Medicaid fraction as it has been given in the Medicare fraction. Defendant points to Judge Batchelder's dissenting opinion, which was that the use of the terms "eligible" and "entitled" reflected the more general use of those terms in the Medicaid and Medicare legislation to describe the respective programs' potential beneficiaries. *Id.* at 278-79 (Batchelder, J., dissenting).

Eligibility standards for Medicaid are set forth at 42 U.S.C. §1396a(a)(10)

US-DIST-CT, MED-GUIDE 1995-2 MED-GUIDE-TB ¶43,725, Deaconess Health Services Corp. v. Shalala., U.S. District Court, Eastern District of Missouri, Eastern Division, (Oct. 16, 1995)
Copyright 1996, CCH Incorporated

and 42 C.F.R. Part 435.\1/ While the states must follow the broad requirements imposed by the Medicaid statute and regulations, states also have flexibility in determining the rules of eligibility. However, an individual must be "needy" and have only very limited income and resources in order to be eligible for medical assistance. *See Wilder v. Virginia Hospital Ass.,* 496 U.S. 498, 502 (1990). The Missouri regulations establish a limit on a hospital's payment. *See* 13 C.S.R. 70-15.010(1), 70-15.030(1). It is undisputed that Missouri's regulations do not affect a patient's Medicaid eligibility and that a hospital is not free to discharge a Medicaid patient simply because the day limit has been reached. A hospital has an obligation under the Social Security Act to "assure" that Medicaid services will be provided economically and to the extent medically necessary and are of a quality which meets professionally recognized standards of health care." Failure to comply with these obligations subject a hospital to exclusion from the Medicaid program. 42 U.S.C. §1320c-5(b)(1); 42 C.F.R. §1001.701(a)(2). The Missouri regulations provide that "[p]articipation in the program shall be limited to hospitals who accept as payment in full for covered services rendered to Medicaid recipients the amount paid in accordance with the regulations implementing the Hospital Reimbursement Program." 13 C.S.R. §70-15.010(10).

The *Jewish Hospital* majority found that the word "eligible" means "capable of receiving" federal medical assistance or Medicaid. The court found no indication from the statute that Congress intended to impute any special meaning to the word "eligible." The court also found that the phrase "the number of the hospital's patient days for such period" modified the term "eligible" and that this phrase speaks to the aggregate number of days for which a hospital provided Medicaid eligible services. Therefore, that court found that all days for which an individual was capable of receiving Medicaid should be figured into the proxy calculation and that a Medicaid eligible person was no less "eligible for medical assistance" on some days simply because his or her state Medicaid program only pays for a fixed number of days. *Jewish Hospital,* 19 F.3d at 274-75. The majority in *Jewish Hospital* treated the Medicaid and Medicare fractions as contrasting provisions because Congress used the word "eligible" in the Medicaid fraction and used the word "entitled" in the Medicare fraction. *Jewish Hospital,* 19 F.3d at 274-75.

Plaintiff argues that both the Medicare and the Medicaid fractions focus on the circumstances of the patient, not the hospital's entitlement to payment. The Medicare statute provides that an individual's "entitlement" to Medicare Part A "is established" by 42 U.S.C. §§426 and 426-1. 42 U.S.C. §1395c. Thus, the reference in the Medicare Low Income Proxy to "patients who (for such days) were entitled to benefits under part A of this title" is clearly to patients who "for such days" met the criteria of 42 U.S.C. §§426 and 426-1.

Defendant argues that the phrase "medical assistance under a State plan approved under [Title XIX]" has no broader meaning than to link the Medicaid fraction to the individual state plans, which as plaintiff concedes, vary in coverage. The plaintiff argues that some patients are "eligible for medical assistance" for only a portion of their hospital stay. The parties agree that the majority of states pay under Medicaid on a per stay or a per discharge basis. Therefore, plaintiff argues, it would make no sense to adopt "days paid" by Medicaid as the standard.

The wording of the Medicaid Low Income Proxy is not ambiguous. The statute
directs the Secretary to count the number of patient days which consist of
"patients who (for such days) were eligible for medical assistance under a
State [Medicaid] plan[.]" 42 U.S.C. §1395ww(d)(5)(F)(vi)(II). The plain words
of the statute indicate that the numerator is to consist of the patient days
(without the limitation imported by the defendant) which are attributable to
patients "eligible" for medical assistance under a state Medicaid plan. The
Secretary's construction conflicts with the statute's focus on a patient's
eligibility, by focusing on the state's actual payment to the hospital. The
statute does not refer to patient days actually paid or actually reimbursed
under Medicaid. The undersigned agrees with the reasoning of the *Jewish
Hospital* majority. If a person generally is eligible for medical assistance
under a state plan approved by Medicaid while receiving Part A Medicare
services, then all of the days during which such services were received during
such eligibility should be included in the numerator of the Medicaid Low
Income Proxy, whether or not the state Medicaid plan pays for all such days.
Nothing in the statute permits the Secretary to disregard part of the
patients' duration of the receipt of Medicare Part A services while otherwise
Medicaid eligible and to substitute instead a hospital's limited Medicaid
payment entitlement.

The undersigned notes that the statute does not specify "eligible for
inpatient hospital services" but rather uses the words "eligible for medical
assistance," which conveys a broader meaning. The Medicaid statute defines
"medical assistance" as encompassing twenty-five items of care and service. 42
U.S.C. §1396d(a). "Inpatient hospital services" is only one of those
twenty-five items. 42 U.S.C. §1396d(a)(1). Therefore, even if the Missouri
Medicaid regulations rendered a Medicaid patient "ineligible" for inpatient
hospital services for a particular day, they would not render the patient
"ineligible" for "medical assistance" generally. The patient would still be
eligible to receive other services for that day. 42 U.S.C. §1396d(a)(2)-(25).

This construction supports the statutorily-mandated purpose of the
"disproportionate patient percentage," of which the "Medicaid Low Income
Proxy" is a component. Congress sought to provide a supplemental PPS payment
for PPS hospitals that serve "a significantly disproportionate number of
low-income patients...." 42 U.S.C. §1395ww(d)(5)(F)(i)(I). The numerators of
the two fractions establishing the "disproportionate patient percentage"
identify "low-income patients." The numerator of the Medicaid Low Income Proxy
consists of patient days attributable to patients "eligible for medical
assistance" because a patient must be a "low-income patient" to be "eligible
for medical assistance."

A literal construction of the Medicaid Low Income Proxy provision serves the
statutorily-defined purpose. Whether a patient is "eligible for medical
assistance" for particular days is directly relevant to whether the patient is
a "low-income patient" for those days. On the other hand, the Secretary's
construction defeats the statutorily-defined purpose. Whether a state's day
payment limits preclude a hospital from receiving Medicaid reimbursement for
furnishing care to a patient "eligible for medical assistance" for particular
days has no bearing on whether the patient is a "low-income patient" for those

days, the relevant consideration under the statute. *Jewish Hospital,* 19 F.3d
at 275.

Because the undersigned concludes that Congress has spoken to the question
at issue and that the intent of Congress is clear from the language of the
statute, the Court need not address the plaintiff's additional arguments.

For these reasons, the plaintiff's motion for summary judgment is sustained
and the defendant's motion for summary judgment is denied. An appropriate
order is issued herewith.

*ORDER*

In accordance with the Memorandum filed herewith,

**IT IS HEREBY ORDERED** that the plaintiff's motion for summary judgment (Doc.
No. 16) is sustained.

**IT IS FURTHER ORDERED** that the defendant's motion for summary judgment (Doc.
No. 18) is denied.

**IT IS HEREBY DECLARED** that the defendant's construction limiting the
numerator of the Medicaid Low Income Proxy (42 U.S.C. §1395ww(d)(5)(F)(vi)(II)
to patient days paid under Medicaid is contrary to the plain wording of the
statute.

**IT IS FURTHER DECLARED** that the numerator of the Medicaid Low Income Proxy
includes all patient days attributable to patients eligible for medical
assistance" for such days.

**IT IS THEREFORE ORDERED** that this action is remanded to the defendant for
the prompt payment to the plaintiff of the amount in controversy, plus
interest in accordance with 42 U.S.C. §1395oo(f)(2).

\1/ A state must make medical assistance available to a group known as the
"categorically needy." This group includes individuals who receive aid under
title IV-A of the Social Security Act (Aid to Families with Dependent Children
("AFDC")) or title XVI of the Social Security Act (SSI). In addition, states
may (at their option) provide medical assistance to a group known as the
"medically needy." This group consists of individuals who would be
"categorically needy" except that their income exceeds the aid thresholds
within specified limits. *See DeJesus v. Perales,* 770 F.2d 316, 318-319 (2d
Cir. 1986), *cert. denied,* 478 U.S. 1007 (1986).

US-DIST-CT, MED-GUIDE 1995-2 MED-GUIDE-TB ¶43,725, Deaconess Health Services Corp. v. Shalala., U.S. District Court, Eastern District of Missouri, Eastern Division, (Oct. 16, 1995)
Copyright 1996, CCH Incorporated

"categorically needy" except that their income exceeds the aid thresholds within specified limits. *See DeJesus v. Perales*, 770 F.2d 316, 318-319 (2d Cir. 1986), *cert. denied*, 478 U.S. 1007 (1986).

# <u>Exhibit 3</u>

 **DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the General Counsel
Health Care Financing Division

OCT 19 2000

Mr. Irvin W. Kues, Chairman
Attn.: Kathleen Scully-Hayes
Provider Reimbursement Review Board
7500 Security Boulevard
Room C1-09-13
Baltimore, MD 21244-1850

**RECEIVED**

OCT 19 2000

PROVIDER REIMBURSEMENT
REVIEW BOARD

Re:    DSH Subpoenas

Dear Chairman Kues:

This letter is to notify you of a new system of records entitled *Medicare Provider Analysis and Review* ("MEDPAR"), HHS/HCFA/OIS, 09-07-0009, which was published in the Federal Register on August 18, 2000. 65 Fed. Reg. 50548 (Aug. 18, 2000). This system of records establishes a system to collect and disseminate the information necessary "to recalculate Supplemental Security Income ("SSI") ratios for hospitals that are paid under the [Prospective Payment System] and serve a disproportionate share of low-income patients." *Id.* This data is a key component in determining whether affected hospitals may be entitled to increased reimbursement under Part A of the Medicare program. The MEDPAR system of records became effective on September 27, 2000 and contemplates the release of collected data to hospitals with properly pending appeals before the PRRB. We believe the publication of this new system alleviates the need for the issuance of Board subpoenas for the production of the MEDPAR data.

Pursuant to the Board's Instructions, the Board issues subpoenas only when the requesting party can show that "what it is requesting by subpoena could not be secured by other means." PRRB Instructions A(II)(e). This new system of records demonstrates that providers now have access to data relevant to establishing the disproportionate share payments for providers through the MEDPAR system of records. Providers interested in obtaining relevant data should be instructed to contact JoAnn Cerne, Analyst in the Division of Acute Care, at 410-786-4530 to request such data.

If you have any questions or wish to discuss this further, do not hesitate to contact Linda A. Banks at 202-401-7391.

Sincerely,

Marcus H. Christ Jr.
Supervisory Trial Attorney
Office of the General Counsel

# QUALITY REIMBURSEMENT SERVICES
### Healthcare Consultants

April 17, 2002


Ms. JoAnn T. Cerne
Health Insurance Specialist
Division of Acute Care
Center for Medicare and Medicaid Services
7500 Security Blvd., Mailstop C4-07-07
Baltimore, MD  21244-1850

Re:     Provider Name        :   BMH – St. Joseph Hospital
        Provider Name        :   44-0071
        PRRB Case Number :   01-3359
        Fiscal Period Ended :   December 10, 1998

Dear Ms. Cerne:

This is in reference to the letter (attached) from Marcus Christ, Supervisory Trial
Attorney, Office of the General Counsel informing the Provider Reimbursement Review
Board that it is no longer required to issue subpoenas for Patients who were recipients of
Supplemental Security Income (SSI), since the data can be obtained from CMS (Center
for Medicare and Medicaid Services.

We understand that you are authorized to furnish aggregate monthly SSI statistics that do
not identify patients.  Please forward the data for the under mentioned period.

                October 1, 1997 through December 10, 1998

If you have any questions, please feel free to contact me at (626) 445-5092.

Sincerely,

J. C. Ravindran
President

cc:     Mr. Mike Shaver, Appeals Coordinator, Riverbend Government Benefits
        Administrator, 730 Chestnut Street, Third Floor, Chattanooga, TN 37402-1790

        Mr. Fred Staats, Reimbursement Manager, Baptist Memorial Healthcare
        Corporation, 899 Madison Avenue, Memphis, TN  38146
Encl.


JCR:DR

# Exhibit 4

# BMH - ST. JOSEPH HOSPITAL
## PROVIDER NUMBER 44-0071
## FYE 12/31

### SSI STATISTICS FOR 1985 - 1999

| YEAR | SSI DAYS | COV. DAYS | SSI RATIOS |
|------|----------|-----------|------------|
| 1985 | 8824 | 29912 | 0.294999 |
| 1986 | 10931 | 41347 | 0.264372 |
| 1987 | 11849 | 47856 | 0.247597 |
| 1988 | 10544 | 45965 | 0.229392 |
| 1989 | 11073 | 45235 | 0.244788 |
| 1990 | 10100 | 38306 | 0.263666 |
| 1991 | 11821 | 40859 | 0.289312 |
| 1992 | 11267 | 40350 | 0.279232 |
| 1993 | 11225 | 40297 | 0.278557 |
| 1994 | 11433 | 39402 | 0.290163 |
| 1995 | 10538 | 34796 | 0.302851 |
| 1996 | 9319 | 31465 | 0.296170 |
| 1997 | 9883 | 33868 | 0.291809 |
| 1998 | 7832 | 27689 | 0.282856 |
| 1999 | 1424 | 4471 | 0.318497 |



# **<u>Exhibit 5</u>**

BMH-MEMPHIS DBA ST.JOSEPH 44-0071
DSN CALCULATION
12/10/98

| | | Date | Prepared By | | Work Paper No |
|---|---|---|---|---|---|
| | | 5/15/01 | Reviewed By | L.19.01 | F 610 |

F 610
E900

BMH-MEMPHIS DBA ST. JOSEPH 44-0071          Prepared By: ___ Date: 6/27/01
DSH-CALCULATION                              Reviewed By: ___ Date: ___
12/10/98

PREPARED BY INTERMEDIARY

PURPOSE: To property report the DSH calculation on the cost report. See the needed PAJE's below.

| | | PER INTERMEDIARY | PER COST REPORT | VARIANCE | |
|---|---|---|---|---|---|
| TENNCARE DAYS | F-630 | 8,822 | | | |
| OUT-OF-STATE MEDICAID DAYS | F-650 | 53 | | | |
| MEDICAID DAYS (INCLUDING NURSERY) | | 8,875 | 1 | 8,874 | S-3 (I), l.1,c.5 |
| MEDICAID HMO DAYS | | 0 | 13,326 | (13,326) | S-3 (I), l.2,c.5 |
| TOTAL DAYS (INCLUDING NURSERY) | CR | 43,903 | 43,903 | - | S-3 (I), l.12,c.6 |
| RATIO OF MEDICAID/TOTAL DAYS | | 20.22% | 30.36% | -10.15% * | E(A), l.4.01,c.1 |
| SSI % | C | 28.29% | 27.86% | 0.43% | E(A), l.4,c.1 |
| DISPROPORTIONATE PATIENT % | | 48.51% | 58.22% | -9.72% * | E(A), l.4.02,c.1 |
| ALLOWABLE DISPROPORTIONATE SHARE % | | 29.23% | 49.95% | -20.72% | E(A), l.4.03,c.1 |

[( DPP % - 20.2 %)(.825) + 5.88% ] X [OUTLIER + FSP]        B

|       |   F-100       |   F-100 |
[( 0.485050 -20.2 %)(.825) + 5.88%] X [ 14,857,351 + ] (For DRG's 12/1/97 - 9/30/98)

        0.292316      X      14,857,351

        4,343,041     X      99%          (Reduce 1% for discharges on or after 10/1/97)

|                |   F-100       |   F-100 |
[( 0.485050 -20.2 %)(.825) + 5.88%] X [ 2,286,729 + 0 ] (For DRG's 10/1/98 - 12/10/98)

        0.292316      X      2,286,729

        668,447       X      98%          (Reduce 2% for discharges on or after 10/1/98)

                TOTAL DSH ADJUSTMENT    4,954,690    7,585,375    (2,630,685) *    E(A), l.4.04,c.1

C. PER SSI/MEDICARE BENEFICIARY DATA FOR FEDERAL FY 97 FURNISHED BY
   HCFA.

B. FORMULA PER HCFA INSTRUCTIONS: URBAN HOSPITAL, OVER 100 BEDS,
   DISCHARGES ON OR AFTER 10-1-94, AND DPP >20.2%.

* NO ADJUSTMENT NEEDED. AUTOMATICALLY COMPUTED DURING FINALIZATION OF COST REPORT.

PAJE> TO PROPERLY COMPUTE THE DSH CALCULATION TO BE REPORTED ON THE C/R.

| | | | |
|---|---|---|---|
| S-3 (I), Ln.2,Col.5 MEDICAID HMO DAYS | 13,326 | (13,326) | 0 |
| S-3 (I), Ln.1,Col.5 MEDICAID DAYS | 1 | 8,874 | 8,875 |
| PER 42 CFR 412.106 | | | |

PAJE> TO PROPERLY COMPUTE THE DSH CALCULATION TO BE REPORTED ON THE C/R.

| | | | |
|---|---|---|---|
| E(A), Ln.4,Col.1  SSI % | 27.86% | 0.43% | 28.29% |
| E(A), Ln.4.03,Col.1 ALLOWABLE DISPROPORTIONATE SHARE % | 49.95% | -20.72% | 29.23% |
| PER 42 CFR 412.106 | | | |